772 F.2d 1103
 23 ERC 1574, 15 Envtl. L. Rep. 20,940
 JERSEY CENTRAL POWER & LIGHT COMPANY
v.
TOWNSHIP OF LACEY, an incorporated village located in Ocean
County, State of New Jersey.
Appeal of TOWNSHIP OF LACEY, Appellant.
 Nos. 84-5652, 84-5763.
 United States Court of Appeals,
Third Circuit.
 Argued April 30, 1985.
Decided Sept. 6, 1985.
As Amended Sept. 23, 1985.
 
 Martin S. Siegel (argued), Peter S. Kaufman, Edward K. Dehope, Susan K. Fischer, Riker, Danzig, Scherer & Hyland, Morristown, N.J., for appellee; Bishop, Liberman & Cook, New York City, of counsel.
 Terry F. Brady (argued), Gilmore & Monahan, P.A., Toms River, N.J., for appellant.
 Before GIBBONS and HIGGINBOTHAM, Circuit Judges, and NEWCOMER, District Judge.*
 OPINION OF THE COURT
 A. LEON HIGGINBOTHAM, Jr., Circuit Judge.
 
 
 1
 The transport and storage of "hazardous materials" has generated increasing concern over the unpredictable risks presented to the public, while at the same time, it is recognized that our modern society depends upon the transformation of atomic power into energy and the ready availability of these fissionable materials for industrial, commercial and consumer use. This mixed blessing of technological progress and enhanced public sensitivity to environmental issues has led to rigorous federal, state and local regulation in the nuclear energy field.
 
 
 2
 This appeal exemplifies the familiar clash between society's desire to reap the benefits of nuclear technology and society's understandable apprehension regarding the safety and environmental impact such usage entails. This appeal calls upon us to interpret the preemptive features of the Atomic Energy Act of 1954, 42 U.S.C. Secs. 2011-2282 (1982), and the Hazardous Materials Transportation Act, 49 U.S.C. Secs. 1801-1812 (1982), as they impact upon local regulation of the transportation and storage of radioactive nuclear materials.
 
 
 3
 In this case, the district court declared unconstitutional, and therefore void and unenforceable, a township ordinance which prohibits the importation of "spent nuclear fuel or other radioactive waste for the purpose of storage" within the locality, as inconsistent with the aforementioned federal statutes. The locality appeals from the issuance of a permanent injunction precluding governmental interference with a six-month campaign of shipping radioactive nuclear waste into the locality for storage as well as from a declaratory judgment declaring the township's prohibitory ordinance invalid.
 
 
 4
 We will affirm the district court's grant of summary judgment in favor of the nuclear generating station which engaged in the shipping campaign because we find this locality's outright ban on the importation and storage of radioactive materials to be in conflict with federal law.
 
 I.
 A. Background--The NYSERDA Case
 
 5
 Jersey Central Power and Light ("JCP&L") is a public utility incorporated under the laws of the State of New Jersey and is the owner of the Oyster Creek Nuclear Generating Station ("Oyster Creek"), located in Lacey Township, New Jersey. Oyster Creek is a nuclear power plant and a federally licensed "utilization facility" as defined by the Atomic Energy Act of 1954. ("AEA"), 42 U.S.C. Sec. 2014(cc).[1] As such, it is authorized to generate nuclear energy and also to receive and store on-site "special nuclear material", a classification which encompasses spent nuclear fuel ("spent fuel"). 42 U.S.C. Sec. 2014(aa).
 
 
 6
 The fuel for nuclear electric power reactors--uranium enriched in the isotope 233 or 235--becomes depleted after a few years in the reactor and has to be replaced. Spent fuel is intensely radioactive and its radioactivity is very long-lived, therefore it constitutes "hazardous materials" as defined in the Hazardous Materials Transportation Act ("HMTA"), 49 U.S.C. Sec. 1802(2).[2] The question of what to do with it is a troublesome one; nuclear waste must be quite carefully stored.
 
 
 7
 The general practice is now to store spent fuel in a water-filled pool at the reactor site. In the late 1960's and early 1970's, it was assumed by the nuclear industry that this spent fuel would be reprocessed so as to recover and recycle the remaining fissionable products. Accordingly, the storage pools at reactor sites were designed as short-term holding facilities. Thus, in 1975, Nuclear Fuel Services contracted to supply reprocessing services to JCP&L for spent fuel that was generated at Oyster Creek and to store that fuel at the Western New York Nuclear Service Center. This facility is owned by the New York State Energy Research and Development Authority ("NYSERDA"), and is located in West Valley, New York. Pursuant to this contractual arrangement, JCP&L transported 224 of its 980 spent fuel assemblies from its Oyster Creek nuclear plant to West Valley, New York. In September of 1976, however, Nuclear Fuel Services withdrew from the reprocessing business and the 224 spent fuel assemblies were never reprocessed. They simply remained in the West Valley storage pool.
 
 
 8
 Due to a dispute between NYSERDA and JCP&L and certain other public utilities storing fuel at the West Valley facility, NYSERDA commenced an action in the United States District Court for the Western District of New York entitled New York State Energy Research and Development Authority v. Nuclear Fuel Services, Inc., Civ.No. 82-426 (W.D.N.Y.) ("the NYSERDA case"). NYSERDA alleged liability for removal of the spent fuel stored at the disposal and reprocessing center and for pecuniary compensation upon theories of trespass, breach of contract and unjust enrichment. The district court ruled that JCP&L would be a trespasser if NYSERDA's unequivocal demand for removal was made and ignored. New York State Energy Research and Development Authority v. Nuclear Fuel Services, Inc., 561 F.Supp. 954 (W.D.N.Y.1983).
 
 
 9
 Subsequently, NYSERDA made an unequivocal demand for removal of JCP&L's spent fuel. On September 30, 1983 NYSERDA and JCP&L entered into a partial settlement agreement which was later incorporated into the district court's October 14, 1983 order directing JCP&L to commence the removal of its 224 spent fuel assemblies from West Valley by October 1, 1984 and complete removal by May 31, 1985.[3] The transportation of these 224 spent fuel assemblies from West Valley, New York to the Oyster Creek facility spawned additional proceedings in the United States District Court for the District of New Jersey.[4] Its storage, understandably, underlies this appeal.[5]
 
 
 10
 B. Jersey Central Power and Light Co. v. Township of Lacey, Nos. 84-5652 and 84-5763 ("The Township of Lacey Action")
 
 
 11
 On August 25, 1983, during the pendency of the New York federal action, the Township of Lacey, an unincorporated village located in Ocean County, New Jersey, enacted into law the "Spent Fuel Ordinance" in question here.[6] This ordinance prohibits the importation of any spent nuclear fuel or other radioactive waste for the purpose of storing the same within the Township of Lacey.
 
 
 12
 JCP&L wanted to return the 224 spent fuel assemblies stored at the West Valley facility to Oyster Creek's storage facility since, according to JCP&L, the Oyster Creek facility was the only viable alternative storage facility. Because it was prevented from doing so by the Spent Fuel Ordinance, JCP&L filed a complaint against the Township of Lacey seeking a declaration that the ordinance was invalid and unenforceable because it violated the Constitution and statutes of the United States. In addition, JCP&L sought an order enjoining enforcement of the ordinance as well as other relief, including damages.
 
 
 13
 Subsequent to the Township of Lacey's Answer, JCP&L moved for summary judgment pursuant to Fed.R.Civ.P. 56 on its claims that the ordinance was unconstitutional and invalid because it was preempted by the AEA, the HMTA and violated the Commerce Clause, U.S. Const. art. I, Sec. 8. The motion did not encompass the damages issues but sought only declaratory and injunctive relief.
 
 
 14
 After hearing argument on the motion, Judge Bissell issued a ruling from the bench on September 24, 1984, granting JCP&L's motion for summary judgment. He ruled that there was no dispute as to any issue of material fact and that the Spent Fuel Ordinance was, as a matter of law, unconstitutional under both the Supremacy Clause, U.S. Const. art. VI, cl. 2, and the Commerce Clause. The district court declared the ordinance unconstitutional and therefore void and unenforceable and permanently enjoined the Township from its enforcement. The district court also denied the Township's motion for a stay pending appeal. On September 27, 1984, the Township noticed appeal.
 
 
 15
 The Lacey Township Committee then amended the August 25, 1983 ordinance on October 24, 1984 to impose criminal penalties on any person or entity returning spent fuel to Lacey Township.[7] On October 26, 1984, JCP&L filed a Notice of Motion for Enforcement of Judgment and Other Relief in which it sought to have declared invalid the amendatory Penalty Ordinance. Judge Bissell granted the motion, declared the Penalty Ordinance unconstitutional and further enjoined the Township of Lacey from enforcing the August 25, 1983 Spent Fuel Ordinance as amended. The Township again noticed appeal and its two appeals were consolidated by order of this Court on November 29, 1984.
 
 II.
 
 16
 Initially, we must address the question whether this case is now moot, inasmuch as the controversial shipping campaign of spent nuclear fuel concluded on July 9, 1985 and the 224 spent fuel assemblies are presently being stored at the Oyster Creek nuclear facility.[8] We must consider whether the cessation of the challenged activity by the plaintiff JCP&L renders this case moot or any of the individual claims raised herein.
 
 
 17
 A case becomes moot if (1) it can be said with assurance that there is no reasonable expectation that the alleged violation will recur, and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation. County of Los Angeles v. Davis, 440 U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642 (1979); Galda v. Bloustein, 686 F.2d 159, 162-63 (3d Cir.1982); Finberg v. Sullivan, 658 F.2d 93, 97-98 (3d Cir.1980) (in banc).
 
 
 18
 A question is moot when it no longer presents a live controversy or if the parties lack a cognizable interest in the outcome. North Carolina v. Rice, 404 U.S. 244, 92 S.Ct. 402, 30 L.Ed.2d 413 (1971). If a defendant has discontinued the challenged activities a case is moot if there is no reasonable expectation that the wrong will be repeated. Murphy v. Hunt, 455 U.S. 478, 482, 102 S.Ct. 1181, 1183, 71 L.Ed.2d 353 (1982); Hudson v. Robinson, 678 F.2d 462, 465 (3d Cir.1982). Underlying these principles, is the fact that there is no effectual relief that can be afforded by the court should it decide the case in favor of the plaintiff. Mills v. Green, 159 U.S. 651, 653, 16 S.Ct. 132, 133, 40 L.Ed. 293 (1895).
 
 
 19
 We believe that the issues presented are still live and the parties have some cognizable interest in the outcome. The lawsuit between JCP&L and the Township of Lacey has not been mooted by the delivery of the 224 spent fuel assemblies to Oyster Creek for two reasons. First, JCP&L requested an injunction precluding the enforcement of the Spent Fuel and Penalty Ordinances and the activity challenged by these provisions is JCP&L's importation and storage of the nuclear waste at Oyster Creek. Thus, the cessation of the plaintiff's shipping campaign does not eradicate the effects of the continued storage of the rods and the defendant's representations to enforce its ban. Were we to declare the Township's Spent Fuel Ordinance constitutional, the Township would then be entitled to a permanent injunction requiring the removal of the spent fuel rod assemblies because violation of its ordinance continues each day that the nuclear waste remains stored within the Township's borders.
 
 
 20
 Secondly, the Township's Penalty Ordinance provides for monetary penalties for each day of violation. The Township's Penalty Ordinance was declared unconstitutional in conjunction with the main regulatory ordinance and the Township was prohibited from its enforcement. Should this Court find that the district court erred in concluding that the ordinances violate constitutional standards and therefore abused its discretion in issuing the injunction, the Township would have the authority to impose appropriate fines. Therefore, the constitutionality of the challenged ordinances and the degree of local authority to be retained by municipalities with respect to the regulation of nuclear reactors within their midst, give rise to vital legal issues of substantive merit despite the fact that JCP&L has completed its shipping campaign.
 
 
 21
 In short, the present litigation has retained its vitality as a "case or controversy" for Article III, U.S. Const. art. III, Sec. 2, purposes--this is not a case where the judgment rendered by our Court will have no practical effect upon the existing controversy. Judgment in favor of JCP&L would resolve the issue of the legality of its continued storage of these 224 rods and its criminal liability. Judgment in favor of the Township of Lacey could afford both legal and equitable remedies for the violation of its ordinances. We will therefore proceed to the merits of this case.
 
 III.
 
 22
 In evaluating the propriety of the governmental regulations in this appeal, our standard of reviewing a grant or denial of summary judgment is plenary. A grant of summary judgment is appropriate only where it appears from the pleadings, depositions, admissions, answers to interrogatories, and affidavits, considered in the light most favorable to opposing parties, that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); EEOC v. Westinghouse Electric Corp., 725 F.2d 211, 218 (3d Cir.1983), cert. denied sub nom. Westinghouse Electric Corp. v. EEOC, --- U.S. ----, 105 S.Ct. 92, 83 L.Ed.2d 38 (1984); Harrison v. Byrd, 765 F.2d 501 (5th Cir.1985).
 
 
 23
 We affirm the district court's grant of summary judgment invalidating the Township of Lacey's Spent Fuel and Penalty Ordinances because we find that (a) there are no genuine issues of material fact in dispute; (b) as a matter of law, the ordinances are preempted by the AEA and hence violative of the Supremacy Clause; and (c) as a matter of law, the ordinances are preempted by the HMTA and, on this basis, are also contrary to the Supremacy Clause.[9]
 
 A.
 
 24
 We agree with JCP&L's contention that the facts alleged by the Township to be in issue are neither material nor essential to a determination that the ordinances are unconstitutional.
 
 
 25
 Lacey, on appeal, questions essentially only one of JCP&L's factual assertions: that Oyster Creek is the only viable spent fuel storage facility available to store JCP&L's 224 spent fuel assemblies, as asserted in paragraph 13 of the JCP&L's Affidavit. Appendix ("App.") at 64; Appellant's Brief at 12.
 
 
 26
 Whether or not there are actually other viable storage facilities, the determination of such fact is not germane to the issue of the constitutional legitimacy of this local entity's importation regulation. The mere existence of factual issues where those issues are not material to claims before this Court will not suffice to defeat a motion for summary judgment. Quarles v. General Motors Corp., 758 F.2d 839, 840 (2d Cir.1985). We are dealing with a fundamental conflict between the locality's interest in the exercise of its police power for public health and safety purposes and an established federal regulatory scheme. The questions posited are whether there has been federal preemption and whether the local regulation conflicts with federal law. A summary judgment order is not defeated merely because an issue of fact exists; the factual issue in dispute must be material to the resolution of the dispute. Westinghouse Electric Corp., 725 F.2d at 218. That is, it must be outcome determinative under the applicable law. Big O Tire Dealers, Inc. v. Big O Warehouse, 741 F.2d 160, 163 (7th Cir.1984).
 
 
 27
 Even assuming, arguendo, that proof of the existence of viable storage sites other than Oyster Creek at which the spent fuel at issue could have been stored would constitute a material fact, the Township failed to set forth specific facts demonstrating, under Fed.R.Civ.P. 56(c), that there is a genuine issue for trial. Although the burden of proof rests initially with the party moving for summary judgment, when a motion is made and supported, the nonmoving party must produce specific facts showing that there is a genuine issue for trial, rather than resting upon the assertions of pleading; a genuine issue means that the evidence must create a fair doubt, and wholly speculative assertions will not suffice. Ross v. Communications Satellite Corp., 759 F.2d 355, 364 (4th Cir.1985). The Township of Lacey has failed to present any basis for its beliefs, other than its verified Answer and Memoranda of law below and to this Court. Legal memoranda and oral argument are not evidence and cannot by themselves create a factual dispute sufficient to defeat a summary judgment motion. "Denials in the form of legal conclusions, unsupported by documentation of specific facts, are insufficient to create issues of material fact that would preclude summary judgment." Securities and Exchange Commission v. Bonastia, 614 F.2d 908, 914 (3d Cir.1980).
 
 
 28
 In sum, the material facts relevant to this appeal are not in dispute. We turn now to the legal questions of whether the district court correctly held that the Ordinances are preempted by the AEA and the HMTA.
 
 B.
 
 29
 Resolving this conflict between a local ban on the importation of nuclear waste and the federal interest in the civilian development of nuclear energy presents a constitutional inquiry with its roots in the Supremacy Clause, which elevates federal law above that of the states.[10] See Gibbons v. Ogden, 22 U.S. (9 Wheat.) 1, 92-93, 6 L.Ed. 23 (1824).
 
 
 30
 The Supremacy Clause mandates that federal law preempts any state regulation of any area over which Congress has expressly or impliedly exercised exclusive authority. Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 236, 67 S.Ct. 1146, 1155, 91 L.Ed. 1447 (1947). Thus, preemption may occur in a number of contexts. Congress may expressly indicate that the authority conferred by it is exclusive. This indication may be manifested by statutory language, Jones v. Rath Packing Co., 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977), or by the legislative history. Preemption may also arise from an actual conflict between federal and state regulations where compliance with both is a "physical impossibility", Florida Lime & Avocado Growers Inc. v. Paul, 373 U.S. 132, 142-43, 83 S.Ct. 1210, 1217-18, 10 L.Ed.2d 248 (1963), or state law may impede the "execution of the full purposes and objectives of Congress." Hines v. Davidowitz, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941).
 
 
 31
 Where there has been neither an express intention by Congress to preempt a subject matter nor an inevitable federal-state conflict, the federal scheme may nonetheless imply preemption. The scheme of federal regulation may be "so pervasive as to make reasonable the inference that Congress left no room to supplement it ..." Pacific Gas & Electric Co. v. State Energy Resources Conservation and Development Commission, 461 U.S. 190, 204, 103 S.Ct. 1713, 1722, 75 L.Ed.2d 752 (1983) (quoting Fidelity Federal Savings & Loan Assn v. De la Cuesta, 458 U.S. 141, 153, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664 (1982)).
 
 
 32
 The comprehensive federal regulatory structure controlling highway transportation and storage of radioactive materials primarily involves two agencies, the Nuclear Regulatory Commission ("NRC") and the Department of Transportation ("DOT"). See generally Trosten, Federal-State-Local Relationships in Transporting Radioactive Materials: Rules of the Nuclear Road, 68 Ky.L.J. 251 (1979-80). We will examine the scope of the federal statutes and regulations these agencies enforce as well as the preemptive features of each statutory scheme as it pertains to the local legislation in issue.
 
 
 33
 Regulation of Transportation and Storage by NRC--The Scope of the Atomic Energy Act
 
 
 34
 Following the demonstration of the first nuclear reactor in 1942, the test of the atomic bomb in 1945, and its effective military use shortly thereafter during the final stages of World War II, it became readily apparent that legislation was needed to control such a dangerous source of energy. Congress' response was the Atomic Energy Act of 1946, former 42 U.S.C. Secs. 1801-1819, which established the Atomic Energy Commission ("AEC"), the precursor to the NRC, and gave it expansive powers and control with respect to fissionable materials.[11] During these early stages of the development of nuclear technology the regulation and control of nuclear power resided exclusively in the hands of the federal government.
 
 
 35
 The Atomic Energy Act of 1954 was enacted to bring the original act of 1946 into accord with progress in the field of "atomic energy."[12] See H.R.Rep. No. 2181, 83d Cong., 2d Sess. 1-11 (1954). Justice White, speaking for the Supreme Court in Pacific Gas, described the amended federal regulatory structure as the federal government's relaxation of its monopoly over fissionable materials. "[I]n its place, [it] erected a complex scheme to promote the civilian development of nuclear energy, while seeking to safeguard the public and the environment ..." 461 U.S. at 194, 103 S.Ct. at 1717. It vested in the AEC, now the NRC, exclusive jurisdiction to license the transfer, delivery, receipt, acquisition, possession and use of nuclear materials when used for civilian purposes, whether or not they are part of interstate commerce. 42 U.S.C. Secs. 2014, 2061-64, 2071, 2078, 2091-99, 2111-14. This jurisdiction includes, thus, the authority to regulate the shipment and storage of radioactive materials. Upon these subjects, no role was left for the states.
 
 
 36
 In 1959 Congress amended the Atomic Energy Act by adding 42 U.S.C. Sec. 2021(a)(1), specifically addressing the issue of cooperation between the federal and state government and delineating the limited instances in which state regulation of nuclear materials was proper. Congress intended section 2021 to confirm a general federal preemption of the regulation of nuclear activities. The purpose of section 2021 is to provide a framework within which, pursuant to an agreement with the NRC, states may assume the regulation of areas occupied by the NRC.[13] Most important for present purposes, state regulation of the construction and operation of any production or utilization facility is not permitted in a section 2021 agreement.
 
 
 37
 Since the addition of section 274 to the Act in 1959, the NRC has promulgated regulations concerning exemptions from state jurisdiction and continued federal regulatory authority in agreement states. Those regulations provide that persons in agreement states are not exempt from the NRC's licensing and regulatory authority with respect to, inter alia, "[t]he construction and operation of any production or utilization facility" and the "transfer, storage or disposal of radioactive waste matter resulting from the separation in a production facility of special nuclear material from unradiated nuclear reactor fuel." 10 C.F.R. Part 150, 15(a)(4).
 
 
 38
 Furthermore, in Pacific Gas the Supreme Court stressed that "the federal government maintains complete control of the safety and 'nuclear' aspects of energy generation; the states exercise their traditional authority over the need for additional generating capacity, the type of generating facilities to be licensed, land use, rate making, and the like." 461 U.S. at 212, 103 S.Ct. at 1726.
 
 
 39
 In Pacific Gas, utilities brought an action challenging a California statute which conditioned the construction of nuclear power plants on findings by the State Energy Resources Conservation and Development Commission that adequate storage facilities and means of disposal are available. The district court granted relief and the state appealed. The Ninth Circuit reversed in part. The Supreme Court held that in view of the "avowedly economic purpose" behind the disposal means requirement, the requirement was not preempted by federal law. 461 U.S. at 216, 103 S.Ct. at 1728. The Township argues that this is a case such as Pacific Gas because an "avowed economic purpose as the rationale for enacting" the ordinance puts it "outside the occupied field of nuclear safety regulation" and within the ambit of "the states' exercise of their traditional authority over land use." The avowed purpose of the Township ordinances, however, is to protect "the public good" based on "a local legislative determination that an acceleration of nuclear waste storage within the Township is contrary to the general welfare of its inhabitants."
 
 
 40
 Judge Bissell reasoned that the Township ordinances were preempted because they regulate the operation of the Oyster Creek nuclear plant and because they are predicated on safety concerns, thereby ignoring the division between federal and state authority created by the AEA. See, e.g., County of Suffolk v. Long Island Lighting Co., 728 F.2d 52, 59-60 (2d Cir.1984) (responsibility to regulate and enforce the safety aspects of Nuclear energy power remains the sole province of the NRC's expertise.) We find his analysis cogent and thorough.
 
 
 41
 We further agree with his determination that this case is not materially distinguishable from cases in the other Circuits which have held that state laws prohibiting the importation and storage of nuclear waste violated the Supremacy Clause. See, e.g., People of the State of Illinois v. General Electric Co., 683 F.2d 206 (7th Cir.1982), cert. denied sub nom. Hartigan v. General Electric Co., 461 U.S. 913, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1983); Washington State Building and Construction Trades Council v. Spellman, 684 F.2d 627 (9th Cir.1982), cert. denied, 461 U.S. 913, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1983). See generally Annot., 82 A.L.R.3d 751 (1978).
 
 
 42
 Inasmuch as Congress has specifically established this pervasive scheme of federal regulation established by the AEA and NRC regulations, and inasmuch as the legislative history of the AEA and the regulations implementing it establish beyond dispute that it is congressional intent that federal law should regulate the radiological safety aspects of the nuclear power industry, including the storage and shipment of spent fuel, we find that the ordinances under review are unconstitutional.
 
 
 43
 For these reasons, therefore, we affirm the district court's holding that the ordinances are preempted by the AEA and thus are invalid under the Supremacy Clause.
 
 C.
 
 44
 Though it may seem superfluous to consider whether the Spent Fuel Ordinance and Penalty Ordinance are also unconstitutional under the Supremacy Clause because they are preempted by the HMTA and the regulations promulgated thereunder, in the event review is granted and the Supreme Court disagrees with our analysis of the AEA, we additionally consider the preemptive nature of the HMTA.
 
 
 45
 Regulation of Transportation and Storage by DOT--The Scope of the HMTA
 
 
 46
 Congress enacted the HMTA in 1975 to replace a patchwork of sometimes conflicting state regulations concerning routing, packaging and radiological aspects of hazardous material transport with "a general pattern of uniform, national regulations." New Hampshire Motor Transport Association v. Flynn, 751 F.2d 43, 46 (1st Cir.1984). The purpose was to draw the federal government's "now fragmented regulatory and enforcement power over the movement of hazardous materials in commerce into one consolidated and coordinated effort under the direction of the Secretary of Transportation." S.Rep. No. 1192, 93d Cong., 2d Sess. 1 (1974).
 
 
 47
 HMTA empowers the Secretary of Transportation "to protect the Nation adequately against the risks of life and property which are inherent in the transportation of hazardous materials in commerce." 49 U.S.C. Sec. 1801. The Secretary is thereby authorized to promulgate regulations governing "any safety aspect of the transportation hazardous materials which the Secretary deems necessary or appropriate." 49 U.S.C. Sec. 1804(a).
 
 
 48
 Acting pursuant to this grant of authority, the DOT has enacted a comprehensive body of regulations governing the transport of hazardous materials in commerce known as the Hazardous Materials Regulations, codified at 49 C.F.R. Secs. 171-179, including a Final Rule entitled "Radioactive Materials; Routing and Driver Training Requirements," commonly known by its docket number, HM-164, 46 Fed.Reg. 5298 (1981), codified at 49 C.F.R. Sec. 177.825 (1982), which governs the highway transportation of radioactive materials. The ultimate basis for DOT's Final Rule is "that the public risks in transporting these materials by highways are too low to justify the unilateral imposition by local governments of bans and other severe restrictions on the highway mode of transportation." 46 Fed.Reg. at 5299. The constitutionality of HM-164 was upheld in City of New York v. United States Department of Transportation, 715 F.2d 732, 741 (2d Cir.1983), cert. denied, --- U.S. ----, 104 S.Ct. 1403, 79 L.Ed.2d 730 (1984).
 
 Preemptive Nature of HMTA
 
 49
 Under section 1811(a), the HMTA regulations preempt "inconsistent" state and local regulations. 49 U.S.C. Sec. 1811(a). Congress included this provision "to preclude a multiplicity of State and local regulations and the potential for varying as well as conflicting regulations in the area of hazardous materials transportation." S.Rep. No. 1192, 93d Cong., 2d Sess. 37 (1974).
 
 
 50
 A state or local law is "inconsistent" with federal requirements under the HMTA when it is not possible to comply with both, or where state requirements are an obstacle to an execution of federal law. 49 C.F.R. Secs. 107.209(c)(1), (2). The DOT included a policy statement in an appendix to Part 177 of HM-164 ("Appendix A") to assist states and localities in promulgating highway "routing rules"[14] that are not inconsistent with HM-164. A "local routing rule" that applies to a large quantity of radioactive materials is inconsistent with the HMTA if "it prohibits or otherwise affects transportation on routes or at locations" authorized by Part 177 of HM-164.
 
 
 51
 Under this interpretive policy, the Township of Lacey Spent Fuel Ordinance is an inconsistent "routing rule" because it effectively restricts or delays movement by public highway of motor vehicles containing hazardous materials. The district court found that the Spent Fuel Ordinance on its face affects transportation of large-quantity radioactive materials in its literal language and by natural implication and application. The district court further found that DOT regulations contemplate and permit the transportation of nuclear fuel into and out of the Oyster Creek facility. We endorse the district court's conclusion that the ordinance is an inconsistent local regulation under 42 U.S.C. Sec. 1811(a) and, as such, is preempted by the HMTA.
 
 IV.
 
 52
 Accordingly, we affirm the judgment of the district court.
 
 
 
 *
 Honorable Clarence C. Newcomer, United States District Court for the Eastern District of Pennsylvania, sitting by designation
 
 
 [1]
 The term "utilization facility" means (1) any equipment or device, except an atomic weapon, determined by rule of the Commission to be capable of making use of special nuclear material in such quantity as to be of significance to the common defense and security, or in such manner as to affect the health and safety of the public, or peculiarly adapted for making use of atomic energy in such quantity as to be of significance to the common defense and security, or in such manner as to affect the health and safety of the public; or (2) any important component part especially designed for such equipment or device as determined by the Commission. 42 U.S.C. Sec. 2014(cc)
 
 
 [2]
 "[H]azardous material" means a substance or material in a quantity and form which may pose an unreasonable risk to health and safety or property when transported in commerce. 49 U.S.C. Sec. 1802(2)
 
 
 [3]
 The United States District Court for the Western District of New York ordered the removal of JCP & L's spent fuel from West Valley in connection with the implementation by the United States Department of Energy of the West Valley Demonstration Project Act, P.L. 96-368, 92 Stat. 1347 (1980), which is designed to develop solutions to the nation's severe nuclear waste disposal problem
 The United States Department of Energy has taken possession of the West Valley facility for a demonstration project involving the preparation of radioactive waste for disposal. NYSERDA remains the owner. The West Valley Demonstration Project is intended to develop and demonstrate solidification techniques which can be used to prepare high-level radioactive waste for disposal in accordance with the policy objectives of the Nuclear Waste Policy Act of 1982, 42 U.S.C. Secs. 10101-10226 (1982). The continued storage of the spent fuel assemblies at the West Valley facility impacted on the implementation of the West Valley Demonstration Project because completion of the project assumes removal of all spent fuel from the storage pool.
 
 
 [4]
 The transportation of the spent fuel at issue here has generated two related cases: Jersey Central Power & Light Company v. State of New Jersey and Irwin I. Kimmelman, as Attorney General of the State of New Jersey, No. 84-5883 ("The State Action"), and New Jersey Turnpike Authority v. Jersey Central Power & Light Company, et al., No. 85-5003, ("The NJTA Action")
 
 
 [5]
 The Supreme Court recently noted that the storage of nuclear waste has taken on special urgency in this nation. "Some 8,000 metric tons of spent nuclear fuel have already accumulated, and it is projected that by the year 2000 there will be some 72,000 metric tons of spent fuel. Government studies indicate that a number of reactors could be forced to shut down in the near future due to the inability to store spent fuel." Pacific Gas & Electric Co. v. State Energy Resources Conservation and Development Commission, 461 U.S. 190, 195, 103 S.Ct. 1713, 1717, 75 L.Ed.2d 752 (1983) (citing Office of Technology Assessment, Managing Commercial High-Level Waste, 9 (April 1982); H.Rep. No. 785, part 1, 97th Cong., 2d Sess. (1982) 47)
 
 
 [6]
 The Township of Lacey's Spent Fuel Ordinance, No. 24-83, reads as follows:
 ORDINANCE OF THE TOWNSHIP OF LACEY, COUNTY OF OCEAN STATE OF NEW JERSEY, PROHIBITING THE IMPORTATION OF SPENT NUCLEAR FUEL OR RADIOACTIVE WASTE FOR STORAGE WITHIN THE TOWNSHIP OF LACEY, AND REGULATING THE STORAGE OF SPENT NUCLEAR FUEL AND OR RADIOACTIVE WASTE AT THE OYSTER CREEK NUCLEAR POWER PLANT WITHIN THE TOWNSHIP OF LACEY.
 BE IT ORDAINED by the Township Committee of the Township of Lacey, County of Ocean, State of New Jersey, as follows:
 SECTION 1. No persons shall import, transport, or bring into the Township of Lacey any spent nuclear fuel or other radioactive waste for the purpose of storing the same within the Township of Lacey.
 SECTION 2. No spent nuclear fuel or other radioactive waste, other than that generated at the Oyster Creek Nuclear Power Plant located within the Township of Lacey, shall be held for storage within the Township of Lacey. In regard to the Oyster Creek Nuclear Power Plant, no spent nuclear fuel or radioactive waste produced by that plant, which has been removed from the Township of Lacey, shall be brought back into the Township of Lacey for the purpose of storing the same on a temporary or permanent basis.
 SECTION 3. Nothing in this ordinance shall be construed to prohibit the transportation of spent nuclear fuel or radioactive waste through the Township of Lacey as authorized and sanctioned by the Federal Government and State of New Jersey.
 SECTION 4. All ordinances or parts of ordinances inconsistent herewith are hereby repealed.
 SECTION 5. If any section, subsection, sentence, clause, phrase or portion of this ordinance is for any reason held invalid or unconstitutional by a Court of competent jurisdiction, such portion shall be deemed a separate, distinct and independent provision, and such holding shall not affect the validity of the remaining portions hereof.
 SECTION 6. This ordinance shall take effect after second reading and publication as required by law."
 
 
 [7]
 The Penalty Ordinance, No. 56-84, reads as follows:
 AN ORDINANCE OF THE TOWNSHIP OF LACEY, COUNTY OF OCEAN, STATE OF NEW JERSEY, AMENDING AND SUPPLEMENTING CHAPTER 85 OF THE TOWNSHIP CODE OF THE TOWNSHIP OF LACEY, ENTITLED "RADIOACTIVE WASTE," SO AS TO PROVIDE FOR PENALTIES [SIC] PROVISIONS FOR THE VIOLATION THEREOF
 BE IT ORDAINED by the Township Committee of the Township of Lacey, County of Ocean, State of New Jersey, as follows:
 SECTION 1. Chapter 85 of the Township Code of the Township of Lacey, entitled "Radioactive Waste," is hereby amended and supplemented as follows:
 Sec. 85-4. Violations and penalties.
 Any person violating any of the provisions of this article shall, upon conviction, be punishable by a fine not exceeding one thousand dollars ($1,000.) or by imprisonment not exceeding ninety (90) days, or both.
 SECTION 2. All ordinances or parts of ordinances inconsistent herewith are hereby repealed.
 SECTION 3. If any section, subsection, sentence, clause, phrase or portion of this ordinance is for any reason held invalid or unconstitutional by a Court of competent jurisdiction, such portion shall be deemed a separate, distinct and independent provision, and such holding shall not affect the validity of the remaining portions hereof.
 SECTION 4. This ordinance shall take effect after second reading and publication by law.
 
 
 [8]
 This court was so advised by letter briefs filed after oral argument in response to the court's inquiry as to whether the spent fuel shipments had occurred and if so, whether this matter was rendered moot. As mootness is a jurisdictional question, we may consider it sua sponte. See St. Paul Fire & Marine Ins. Co. v. Barry, 438 U.S. 531, 537, 98 S.Ct. 2923, 2927, 57 L.Ed.2d 932 (1978); Memphis Light Gas & Water Div. v. Craft, 436 U.S. 1, 7-8, 98 S.Ct. 1554, 1559-1560, 56 L.Ed.2d 30 (1978); C & C Products, Inc. v. Messick, 700 F.2d 635, 636 (11th Cir.1983)
 See also our discussion of mootness in the related cases: Jersey Central Power & Light Company v. State of New Jersey and Irwin I. Kimmelman, as Attorney General of the State of New Jersey, 772 F.2d 35 (3rd Cir.1985) and New Jersey Turnpike Authority v. Jersey Central Power & Light Company, et al., No. 85-5003.
 
 
 [9]
 In light of our affirmance of the district court's disposition of this matter on the basis of the Supremacy Clause, we do not reach the constitutional issue of whether the ordinances unduly burden interstate commerce
 
 
 [10]
 Article VI, cl. 2, of the United States Constitution provides:
 This Constitution, and the Laws of the United States which shall be made in Pursuance thereof: and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution of Laws of any State to the Contrary notwithstanding.
 The supremacy of federal law is counterbalanced by the Tenth Amendment which reserves to the states those powers not specifically consigned to the federal government or specifically forbidden to the states. U.S. Const. amend. X.
 
 
 [11]
 The Atomic Energy Commission was abolished by the Energy Reorganization Act of 1974, 42 U.S.C. Sec. 5801-5879, which created the Nuclear Regulatory Commission. This in no way changed the scope of federal regulatory power, however
 
 
 [12]
 The term "atomic energy" means all forms of energy released in the course of nuclear fission or nuclear transformation
 42 U.S.C. Sec. 2014(c).
 
 
 [13]
 42 U.S.C. Sec. 2021(a) states that:
 The Commission shall retain authority and responsibility with respect to regulation of
 (1) The construction and operation of any production or utilization facility
 * * *
 (2) the disposal of such ... byproduct, source or special nuclear material as the Commission determines ... should, because of the hazards or potential hazards thereof, not be so disposed of without a license from the Commission.
 
 
 [14]
 The Appendix states, in relevant part:
 "Routing rule" means any action which effectively redirects or otherwise significantly restricts or delays the movement by public highway of motor vehicles containing hazardous materials, and which applies because of the hazardous nature of the cargo.